IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § § | |
| | | DR-19-CR-1363-PRM |
| v. | § § | |
| JAIME SANTIBANEZ, Defendant. | § § § | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

On this day, the Court considered Defendant Jaime Santibanez's [hereinafter "Defendant"] "Motion to Suppress" (ECF No. 28) [hereinafter "Motion"], filed on June 24, 2019; the Government's "Response to Defendant's Motion to Suppress" (ECF No. 29) [hereinafter "Response"], filed on July 8, 2019; Defendant's "Supplemental Response in Support of Motion to Suppress" (ECF No. 38) [hereinafter "Defendant's Supplemental Brief"], filed on August 17, 2019; and the Government's "Supplemental Brief" (ECF No. 39), filed on August 19, 2019, in the above-captioned cause.[1] Defendant argues that the evidence obtained as the result of an automobile stop should be excluded because law enforcement lacked the

---

[1] Both parties' supplemental briefs were filed in response to the Court's sua sponte "Order Requesting Supplemental Briefing" (ECF No. 37), entered on August 9, 2019.

requisite reasonable suspicion to stop Defendant's vehicle. Mot. 13. After due consideration, the Court is of the opinion that the Motion should be denied for the following reasons.

## I.    FACTUAL BACKGROUND

In the early afternoon of May 7, 2019, agents of the United States Border Patrol [hereinafter "Border Patrol"] observed Defendant in the parking lot of the Walmart store located at 496 South Bibb Avenue in Eagle Pass, Texas.[2] Mot. 2; Resp. 2. The agents had arrived at the Walmart parking lot while tracking a tan Ford Edge that they believed was linked to human smuggling operations. Mot. 1–2; Resp. 1–2. Earlier, the agents had identified approximately four passengers concealing themselves in the Ford Edge.[3] Mot. 1–2; Resp. 1–2. Upon arriving at the

---

[2] Eagle Pass, Texas is a city along the United-States-Mexico border, directly across the Rio Grande river from the city of Piedras Negras, Coahuila, Mexico. It sits at the crossroads of United States Highway 277, and United States Highway 57. The Government asserts, and Defendant does not challenge, that this area "is a common and known roadway for illegal smuggling ventures." Resp. 9.

[3] The Government asserts, and Defendant does not challenge, that concealing passengers "is a common tactic used by human smugglers while transporting illegal immigrants." Resp. 2.

Walmart parking lot, the agents observed the Ford Edge approach and park alongside a parked red 2018 Ford F150.  Mot. 2; Resp. 2.

The Border Patrol agents then saw two Hispanic males exit the Ford Edge and enter the Ford F150.  Resp. 2.  The Ford Edge then left the parking lot.  *Id.*  Next, the agents saw Defendant exit the Ford F150 and approach a white Dodge Ram parked a few parking spaces away from the Ford F150.  Mot. 2; Resp. 2.  The agents observed Defendant have a conversation with the driver of the Dodge Ram and then return to the Ford F150 as the Dodge Ram left the Walmart parking lot.[4]  Mot. 2; Resp. 2.  Defendant "appeared nervous and was continuously looking around and over his shoulders."  Resp. 2.  Shortly afterward, the agents saw the same Ford Edge return to the Walmart parking lot and once again park next to the Ford F150.  Mot. 2; Resp. 2.  Thereafter, the agents observed three additional Hispanic males exit the Ford Edge and enter the Ford F150.  Mot. 2; Resp. 2.  The agents then saw Defendant drive the Ford F150 out of the parking lot with the Hispanic males inside.  Mot. 2.  At no

_____

[4] While surveilling these events, the agents conducted records checks on the Ford F150 and Dodge Ram and learned that both were rental vehicles. Mot. 2; Resp. 2.  The Government asserts, and Defendant does not challenge, that it is a "common tactic" for human smugglers to use rental vehicles.  Resp. 2.

3

point did the agents observe Defendant or the occupants of the Ford Edge

and Dodge Ram enter or exit the Walmart store. Resp. 12–13.

Suspecting that Defendant and the occupants of the Ford F150 were

engaged in human smuggling, the Border Patrol agents notified the Eagle

Pass Border Patrol Station and Maverick County Sheriff's Office about

what they had observed and requested that law enforcement officers in

the area assist in conducting traffic and immigration stops on the Ford

F150 and its occupants. Mot. 2; Resp. 2; Homeland Security

Investigations – Report of Investigation 2 [hereinafter "DHS Report"],

June 24, 2019, ECF No. 28-1. Subsequently, this request was broadcast to

law enforcement officers in the surrounding area. Mot. 2; Resp. 3. After

receiving this request, Maverick County Constable Alejandro Gonzalez

initiated a traffic stop on the Ford F150 at the 2600 block of Del Rio

Boulevard in Eagle Pass, Texas.[5] Mot. 2–3; Resp. 3. During the stop,

---

[5] The stated reason for this traffic stop was "Obstruction of View,"
whereby Constable Gonzalez allegedly observed a blue work helmet
resting on the Ford F150's dashboard. See Maverick County Constable
Warning, June 24, 2019, ECF No. 28-2. The blue work helmet's location
at the time of the stop is the only significant fact in dispute. See Mot. 3;
Resp. 3.

Constable Gonzalez identified Defendant as the Ford F150's driver and discovered six Hispanic male passengers. Mot. 3; Resp. 3.

Shortly after Constable Gonzalez initiated the traffic stop, Border Patrol agents arrived to conduct an immigration inspection. Resp. 3; DHS Report 3. The agents discovered that all six Hispanic male passengers were illegally present in the United States. Mot. 3; Resp. 3. As a result of this discovery, Defendant was arrested and transported to the Eagle Pass Texas Border Patrol South Station. Mot. 3–4; Resp. 3. Once submitted to questioning, Defendant made a series of statements to the agents before invoking his right to counsel.[6] Mot. 4; Resp. 3–4. On June 5, 2019, Defendant was indicted on two counts: (1) Conspiracy to Transport Illegal Aliens pursuant to 8 U.S.C. § 1324(a)(1)(A)(v)(I) & (B)(i), and (2) Illegal Alien Transportation pursuant to 8 U.S.C. § 1324(a)(1)(A)(ii) & (B)(i). Indictment, ECF No. 18.

---

[6] The Government asserts, and Defendant does not challenge, that Defendant was advised of his *Miranda* rights and waived his rights before speaking with the Border Patrol agents without an attorney present. Resp. 3; *see Miranda v. Arizona*, 384 U.S. 436 (1966). Because Defendant has not presented a *Miranda* challenge in his Motion, the Court will refrain from making any inquiry into whether these statements are admissible on Fifth Amendment grounds.

On June 24, 2019, Defendant filed his Motion to Suppress (ECF No. 28). Therein, Defendant avers that both Constable Gonzalez's traffic stop, and the Border Patrol agents' subsequent immigration stop, violated the Fourth Amendment. Resp. 4. Specifically, according to Defendant, (1) Constable Gonzalez lacked the requisite reasonable suspicion to conduct a traffic stop because "Obstruction of View" is not a traffic offense pursuant to Texas state law, and (2) the agents' observations in the Walmart parking lot were insufficient to provide reasonable suspicion. *Id.* at 5–7. Based on these alleged Fourth Amendment violations, Defendant argues that the discovery of the six illegal immigrants in the Ford F150 and Defendant's subsequent confession at the Border Patrol station should be suppressed. *Id.* at 11.

On August 9, 2019, after considering Defendant's Motion and the Government's Response, the Court sua sponte requested supplemental briefing. Order Requesting Suppl. Briefing, ECF No. 37. Therein, the Court requested that the parties respond to the following two questions:

> First, if the Court were to determine that the Border Patrol agents had the requisite reasonable suspicion to make an immigration stop after the events in the Walmart parking lot, would that reasonable suspicion extend to Constable Gonzalez when he was asked to assist with a traffic stop? Second, if the Court were to

determine that Constable Gonzalez lacked reasonable suspicion to make a traffic stop such that the exclusionary rule may apply, which evidence, if any, should be excluded if the Court determines that the Border Patrol agents had reasonable suspicion to make the subsequent immigration stop?

*Id.* at 2–3. Both parties filed responses. *See* Def.'s Suppl. Br.; Government's Suppl. Br.

## II. LEGAL STANDARDS

### A. Fourth Amendment

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement 'through means intentionally applied.'" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis removed) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989); *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). When determining the constitutionality of a warrantless temporary

seizure, courts apply a two-part inquiry. *Terry*, 392 at 19–20. First, a court determines whether a stop was reasonable "at its inception." *Id.* at 20. Second, a court considers whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (citing *Terry*, 392 U.S. at 19–20).

First, "[f]or a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion exists when, by the totality of the circumstances, a "detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 266 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). An officer may not rely on "a mere hunch," yet "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a

preponderance of the evidence standard." *Id.* at 274 (citations omitted).

Courts in the Fifth Circuit apply "a multi-factored analysis in deciding 'whether there is reasonable suspicion to stop a car in the border area.'" *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013) (quoting *Brignoni-Ponce*, 422 U.S. 873, 885 (1975)). Those factors, as articulated by the Supreme Court in *United States v. Brignoni-Ponce*, include:

> (1) the characteristics of the area in which the vehicle is encountered; (2) the arresting agent's previous experience with criminal activity; (3) the area's proximity to the border; (4) the usual traffic patterns on the road; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) the appearance of the vehicle; (7) the driver's behavior; and, (8) the passengers' number, appearance, and behavior.

*Id.* As the Fifth Circuit has explained, "None of the factors alone is dispositive, and courts must analyze them as a whole, rather than each in isolation." *United States v. Rico-Soto*, 690 F.3d 376, 380 (5th Cir. 2012); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) ("A factor viewed in isolation is often more 'readily susceptible to an innocent explanation' than one viewed as part of a totality.").

Second, once reasonable suspicion is established, the scope of the detention "must be reasonable in the light of the facts articulated as

9

having created the reasonable suspicion of criminal activity." *Macias*, 658

F.3d at 520 (citing *United States v. Pack*, 612 F.3d 341, 357 (5th Cir.

2010)). In the immigration context, an officer is permitted to question all

of the vehicle's occupants "about their citizenship and immigration status,

and he may ask them to explain suspicious circumstances." *Brignoni-*

*Ponce*, 422 U.S. at 881–82. A defendant's Fourth Amendment rights may

be violated if an officer lacks the reasonable suspicion to make an

immigration stop, or exceeds the scope of that initial justification in their

questioning without additional reasonable suspicion. *See Macias*, 658

F.3d at 518 n.4 (describing Fifth Circuit jurisprudence regarding the

constitutionality of extending stops at immigration checkpoints).

Courts apply the "exclusionary rule" to exclude at trial any evidence

law enforcement obtains through a Fourth Amendment violation. *United*

*States v. Cherry*, 759 F.2d 1196, 1206 (5th Cir. 1985). Additionally, courts

will exclude any "evidence discovered later that is derivative of [the]

illegality, or constitutes 'fruit of a poisonous tree.'" *United States v.*

*Jackson*, 596 F.3d 236, 241 (5th Cir. 2010) (quotation omitted).

## B.    Collective Knowledge Doctrine

The Supreme Court has held that where an acting officer has relied on a request from other officers to make a stop, the stop is reasonable so long as the officers who issued the request "possessed a reasonable suspicion justifying a stop." *United States v. Hensley*, 469 U.S. 221, 233 (1985). Through what has been described as the "collective knowledge doctrine," officers may share reasonable suspicion regardless of whether the officer who ultimately initiates the stop lacks personal knowledge of the articulable facts that provide the legal justification. *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) (citing *Hensley*, 469 U.S. 221 (1985)). As the Fifth Circuit has articulated, "The collective knowledge theory for reasonable suspicion applies so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (citing *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007)).

Through the collective knowledge doctrine, an officer with reasonable suspicion may order another officer to make a stop even if no

traffic violation has occurred. *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008) (citing *United States v. Holloway*, 962 F.2d 451, 459 n.22 (5th Cir. 1992)). Additionally, the collective knowledge doctrine will "preserve[] the propriety of the stop," whether or not the acting officer believes they need additional reasonable suspicion to make the stop. *See Ibarra-Sanchez*, 199 F.3d at 759–60 (determining that a stop was valid despite the informing officer's subjective belief that the acting officer must find independent reasonable suspicion).

Therefore, the collective knowledge doctrine instructs that if an officer has reasonable suspicion to make an immigration stop pursuant to *Brignoni-Ponce*, and that reasonable suspicion is communicated to an acting officer who then makes a stop that is "not significantly more intrusive than would have been permitted the issuing [officer]," *Hensley*, 469 U.S. at 233, the seizure does not violate the Fourth Amendment.

## III. ANALYSIS

In applying the two-step process for determining the constitutionality of a stop, the Court will first analyze whether the Border Patrol agents had reasonable suspicion to make an immigration stop at

the moment that Constable Gonzalez initiated the traffic stop. The Court concludes that the agents did have reasonable suspicion to make an immigration stop. Next, the Court will consider whether Constable Gonzalez was permitted to act on the agents' reasonable suspicion through the collective knowledge doctrine. The Court concludes that Constable Gonzalez was permitted to act.

After establishing reasonable suspicion, part two requires the Court to determine whether the search subsequent to the stop was within the scope of the reasonable suspicion. The Court concludes that the search was within the scope. Accordingly, after due consideration, the Court is of the opinion that the Border Patrol agents and Constable Gonzalez did not violate Defendant's Fourth Amendment rights, and none of the evidence obtained as a result of the stop should be excluded.

## A.    Fourth Amendment

First, the Court considers whether the Border Patrol agents had reasonable suspicion to conduct an immigration stop at the time they contacted the Eagle Pass Border Patrol Station and Maverick County Sheriff's Office requesting assistance. If, as here, "the government

13

searches or seizes a defendant without a warrant, [then] the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). Having carefully considered the undisputed facts in this case, the Court is of the opinion that the Government has satisfied its burden.

In applying the *Brignoni-Ponce* factors, the Court concludes that the Border Patrol agents had reasonable suspicion. Specifically, the following factors, considered in totality, demonstrate that the agents had reasonable suspicion that a possible immigration crime was in progress: Defendant's behavior as the driver of the Ford F150; the passengers' number, appearance, and behavior from the time they entered to the time they exited the Walmart parking lot; the characteristics of the area in and around Eagle Pass, Texas; the proximity to the border; and the usual traffic patterns that would be expected in a Walmart parking lot.[7]

---

[7] Defendant challenges the Government's position that the Border Patrol agents' knowledge and experience are also persuasive factors, arguing that there is insufficient evidence to support the conclusion that the Ford Edge was "linked to a human smuggling operation." Mot. 2, 10. Furthermore, the Government argues that the Border Patrol agents "receive[] training on the techniques, routes, and modus operandi of alien

14

Initially, the Court considers Defendant's behavior as the driver of the Ford F150. Defendant had parked the Ford F150 in a Walmart parking lot presumably in anticipation of the Ford Edge's arrival. Once the Ford Edge arrived and two Hispanic males exited the car, Defendant did not prevent the two males from entering the Ford F150. The Ford Edge departed after this exchange of passengers. Next, Defendant exited the Ford F150 and approached a Dodge Ram, also parked in the Walmart parking lot, before immediately returning to his vehicle. During this time, Defendant was nervous and visually scanning the parking lot. The same Ford Edge then returned, dropping off three additional Hispanic males. Once again, Defendant did not prevent these males from entering the Ford F150. Defendant then drove the Ford F150 out of the Walmart parking lot with at least five passengers in tow who appeared to have just been intentionally transferred from one car to another. Defendant gave no indication that he did not consent to what took place in the parking lot, and his actions suggest some form of knowledge of or cooperation with the

_____

and narcotic smugglers," and receive daily updates "from other agents and area supervisors on smuggling operations in the Eagle Pass area." Resp. 12–13. Because the Court concludes that other factors are sufficient to confer reasonable suspicion, the Court will not consider either argument.

drivers of the Ford Edge and Dodge Ram.

Additionally, the behavior of the five Hispanic male passengers who the Border Patrol agents observed in the Walmart parking lot support the agents' reasonable suspicion that Defendant was involved in an immigration offense. The passengers were first seen concealing themselves in the Ford Edge as it entered the parking lot. As the Government asserts and Defendant does not challenge, human smugglers typically have illegal aliens conceal themselves when being transported in cars. The passengers—despite being in the Walmart parking lot—transferred from one vehicle to another without ever entering the Walmart. Such actions are more consistent with those of individuals who are being illegally transported than those of every day individuals who would not raise any suspicion.

Defendant argues that these behaviors describe a "category of innocent travelers" that is "too [numerous] to result in a reasonable suspicion finding." Mot. 10–11.[8] However, Defendant's and the

_____

[8] Specifically, Defendant cites *United States v. Sokolow*, 490 U.S. 1 (1989). As an example of when factors were insufficient for reasonable suspicion, the *Sokolow* Court cited *Reid v. Georgia*, 448 U.S. 438 (1980), where the only facts available to the arresting officers were that the defendant had

16

passengers' actions in the Walmart parking lot are highly irregular when considering what typically takes place outside of a shopping center. Defendant was linked to three separate vehicles in a short period of time, two of which appeared to participate in a transfer of five illegal aliens. With no indication that anyone was a Walmart shopper, the Court cannot conclude that these factors describe a large category of innocent people.

In addition, Defendant argues that "evasiveness or nervousness provides little to reasonable suspicion." *Id.* at 8 (citing *United States v. Monsivais*, 848 F.3d 353, 359 (5th Cir. 2017). As the Fifth Circuit explained in *Monsivais*, it is common for individuals to exhibit nervous behavior when speaking with police officers and that alone is not enough to confer reasonable suspicion. 848 F.3d at 359. However, here there is no evidence that Defendant had any knowledge that he was under law enforcement observation. Instead, he exhibited nervousness on his own accord.

Furthermore, the facts do not suggest, as Defendant contends, that

---

(1) flown to a city known for cocaine trafficking, (2) had arrived at a time of day when police activity was known to be light, and (3) had not checked a bag. *Sokolow*, 490 U.S. at 9 n.5. These factors apply to a large category of innocent travelers.

he or the passengers were "check[ing] behind themselves" because they were in "parking lots with constantly moving vehicles." Mot. 9. There is no evidence that Defendant or the passengers were crossing through traffic, and the facts suggest that the vehicles were parked near each other. Therefore, a more likely explanation for their behavior would be that these individuals were participating in an immigration offense. Defendant's arguments miss a key point in *Sokolow*. The Supreme Court explained in *Sokolow* that each factor taken individually might "not by itself [be] proof of any illegal conduct." *Sokolow*, 490 U.S. at 9. "[I]nnocent behavior will frequently provide the basis for a showing of" reasonable suspicion when considered in the totality of other factors. *Id.*

In light of the *Sokolow* Court's position, the Court recognizes the larger context of where the agents witnessed Defendant's and the passengers' behavior. Eagle Pass, Texas, is located on a known human smuggling route. The city runs alongside the United States-Mexico border, well within the fifty-mile proximity that courts have found to be persuasive when accompanied by other factors. *See United States v. Rangel-Portillo*, 586 F.3d 376, 380 (5th Cir. 2009) (explaining that the

18

presence of other factors makes proximity relevant). The behavior was not consistent with what would typically be seen in a Walmart parking lot: Drivers parking vehicles and proceeding to shop at the Walmart. Instead, the behavior indicates the transportation of illegal aliens that is typical in the Eagle Pass area. Accordingly, the Court is of the opinion that the Border Patrol agents had reasonable suspicion to initiate an immigration stop.

## B.   Collective Knowledge

Having concluded that the Border Patrol agents had reasonable suspicion to conduct an immigration stop, the Court must now consider whether that reasonable suspicion was imputed to Constable Gonzalez when he initiated his traffic stop. After due consideration, the Court is of the opinion that the undisputed facts satisfy the prima facie case of the collective knowledge doctrine. Constable Gonzalez acted after receiving a law enforcement broadcast to stop Defendant's vehicle. This broadcast was prompted by the agents' request for assistance from local law enforcement. Because the agents had reasonable suspicion and were in contact with Constable Gonzalez, it does not matter whether Constable

Gonzalez had personal knowledge of the articulable facts that provided the constitutional basis for the stop. *See Hensley*, 469 U.S. at 233; *Powell*, 732 F.3d at 369. Thus, Constable Gonzalez's stop was not a seizure in violation of the Fourth Amendment.

The parties provided the Court with arguments regarding whether Constable Gonzalez had reasonable suspicion to initiate a traffic stop for "obstruction of view." Mot. 4–6; Resp. 4–6. Specifically, Defendant argues that the traffic stop was unconstitutional because "obstruction of view" is not a traffic offense pursuant to Texas state law. Mot. 4–6. The Court concludes that this issue is irrelevant because reasonable suspicion already existed through the collective knowledge doctrine. Assuming, *arguendo*, that the Court accepted Defendant's argument that the traffic stop was unreasonable, such a determination would have no impact on whether the evidence should be suppressed.

Presumably, Constable Gonzalez issued a citation with at least the subjective belief that one was necessary. *See United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998) (citing *Whren v. United States*, 517 U.S. 806, 812–14 (1998)) (explaining that a law enforcement officer's subjective

intent for a traffic stop is unrelated to the constitutionality of the stop so long as the reason for the stop is objectively reasonable). When considering a similar case, the Fifth Circuit refused to introduce the officers' subjectivity into its collective knowledge analysis. *See Ibarra-Sanchez*, 199 F.3d at 760. In *Ibarra-Sanchez*, the informing officers who requested the initial bulletin instructed that acting officers "form their own reasonable suspicion." *Id.* at 757. This portion of the request was not included in the bulletin and the acting officers did not identify an independent source of reasonable suspicion. *Id.* The *Ibarra-Sanchez* Court concluded that the informing officer's subjective belief that additional reasonable suspicion was necessary did not impact "the propriety of the stop." *Id.* at 760. The Court sees no reason why Constable Gonzalez's subjective belief should be analyzed differently than the informing officer's belief in *Ibarra-Sanchez*. Accordingly, the Court concludes that Constable Gonzalez's stated reasons for the traffic stop do not impact the permissibility of the stop pursuant to the Fourth Amendment.

Having determined that the stop was permissible, the Court must

consider whether Constable Gonzalez's conduct during the stop was in the scope of the reasonable suspicion that the Border Patrol agents had to make an immigration stop. As the Court has previously explained, an agent with reasonable suspicion to conduct an immigration stop may ask all occupants of the vehicle "about their citizenship and immigration status, and he may ask them to explain suspicious circumstances." *Brignoni-Ponce*, 422 U.S. at 881–82. Here, Defendant has not alleged any facts that suggest that Constable Gonzalez did anything other than stop the vehicle and issue a citation. The facts as presented to the Court suggest that the Border Patrol agents arrived shortly after the traffic stop to conduct their immigration stop. As Defendant alleges no facts to the contrary, the Court must conclude that the stop was within the scope of the reasonable suspicion provided by what the agents observed in the Walmart parking lot. Accordingly, the evidence as to the passengers' status as illegal aliens is not the fruit of an unlawful seizure and should not be suppressed.

Furthermore, Defendant has not argued that the Border Patrol agents lacked probable cause to arrest him after the immigration stop

revealed that he had been driving a vehicle that contained six passengers who were unlawfully in the United States. Moreover, Defendant presents no evidence countering the Government's assertion that he was read his *Miranda* rights before making a valid waiver of his right to an attorney, pursuant to the Fifth Amendment of the United States Constitution. Resp. 3; *see Miranda v. Arizona*, 384 U.S. 436 (1966). Because the Court has determined that the immigration stop was lawful, the incriminating statements that Defendant made while speaking with the agents at the Border Patrol station cannot be excluded absent some other constitutional challenge. Defendant has failed to provide the Court with such an argument. Accordingly, the incriminating statements that Defendant made at the Border Patrol station before invoking his right to counsel should not be suppressed.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendant Jaime Santibanez's "Motion to Suppress" (ECF No. 28) is **DENIED**.

SIGNED this ___5___ day of September, 2019.

_____
PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE